John DOE

v.

The UNITED STATES.

No. 117–84C.

United States Claims Court.

March 7, 1989.

Peter S. Herrick, Miami, Fla., atty. of record, for plaintiff. Michael B. Waitzkin, Washington, D.C., of counsel.

Stuart James, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

HARKINS, Senior Judge.

David Block, through counsel, on March 8, 1984, filed a complaint as John Doe to recover an informer's award pursuant to 8 U.S.C. § 1324 (1982) and 19 U.S.C. § 1619 (Supp. II 1984). The claim was settled by stipulation, and judgment for plaintiff in the amount of $250,000 was ordered on July 29, 1988. The case is now before the court on plaintiff's application for attorney fees, costs and expenses, filed August 29, 1988, pursuant to the Equal Access to Justice Act (EAJA) (28 U.S.C. § 2412(d) (Supp. III 1985)) and Rule 11 of this court. Plaintiff applies for attorney fees in the amount of $85,895, and expenses in the amount of $7,488.48.

The EAJA provides that a prevailing party other than the United States may recover an award for attorney fees and other expenses, in addition to costs, incurred in any civil action, other than cases sounding in tort, brought by or against the United States, "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A) (Supp. III 1985).

The 1985 amendments to the EAJA specifically included recovery of attorney fees and expenses incurred by a plaintiff in a case that ends with a settlement. 28 U.S.C. § 2412(d)(2)(G); Pub.L. No. 99-80, 99 Stat. 185 (1985). The legislative history of the specific amendment to include settlements by stipulation admonishes that courts should avoid "overly technical construction" of terms, and that the procedure "should not be used as a trap for the unwary." Equal Access to Justice Act Amendments, H.R.Rep. No. 99-120, 99th

Cong., 1st Sess. 18, n. 26 (1985) U.S.Code Cong. & Admin.News 1985, pp. 132, 146.

The stipulated settlement provided a judgment in the amount of $250,000, the maximum award authorized in the statute. There is no dispute that in a civil action on the underlying claim plaintiff is a "prevailing party" under the EAJA.

The meaning of the phrase "substantially justified" has been a continuing source of litigation since enactment of the EAJA in 1980. *See Spencer v. N.L.R.B.*, 712 F.2d 539 (D.C.Cir.1983); *Enerhaul v. N.L.R.B.*, 710 F.2d 748 (11th Cir.1983); *Gava v. United States*, 699 F.2d 1367 (Fed.Cir.1983); *Broad Avenue Laundry & Tailoring v. United States*, 693 F.2d 1387 (Fed.Cir. 1982). In 1988, the Supreme Court clarified the differing concepts and defined a standard that equates with the formulation "reasonable basis both in law and fact." A position is "substantially justified" if it is "justified in substance or in the main—that is justified to a degree that would satisfy a reasonable person." *Pierce v. Underwood*, — U.S. —, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988).

The United States bears the burden of proving that its position was "substantially justified." *Gavette v. OPM*, 785 F.2d 1568, 1579 (Fed.Cir.1986). The "position of the United States" includes not only the Government's litigation position in the civil action, but also the action or failure to act by the agency upon which the civil action is based. 28 U.S.C. § 2412(d)(2)(D).

RUSCC 11 requires every pleading, motion, or other paper to be signed by the attorney of record. The rule also provides that the signature of an attorney or party constitutes a certificate by him that (1) he has read the pleading, motion, or other paper, (2) to the best of his knowledge, information, and belief formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law, and (3) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needlessly increase costs. In the event a pleading, motion, or other paper is signed in violation of the rule, the court, on motion or on its own initiative, "shall impose upon the person who signed it, a represented party, or both, an appropriate sanction." The sanction may include an order to pay the expenses reasonably incurred because of the filing, and such expenses may include reasonable attorney fees.

Precedent illuminating FRCP 11 is applicable to the imposition of sanctions under RUSCC 11. The test under the rule is objective in nature. *Hansen v. Prentice-Hall, Inc.*, 788 F.2d 892, 894 (2d Cir.1986); *Eastway Const. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985). The standard which controls is one of "reasonableness under the circumstances." *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1177 (D.C.Cir.1985). Each case must be examined in light of the particular facts involved, and a ruling involves consideration of the degree of reasonableness in the challenged conduct. The conduct of counsel is to be judged as of the time the pleading was filed, and in its ruling, the court is to "avoid hindsight and resolve all doubts in favor of the signer." *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir.1986), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

PROCEDURAL HISTORY

Plaintiff's March 8, 1984, complaint concerned information about a Lear Jet aircraft, Serial No. 35A–280, bearing Registration No. YN–BVO, which landed at Miami International Airport on September 1, 1980. Plaintiff, an attorney admitted to the practice of law in Florida, landed at the airport in a private plane just after the Lear Jet. Plaintiff observed that the Lear Jet bore Nicaraguan registration numbers, and that the crew members, apparently Cuban, had Nicaraguan passports. Plaintiff became suspicious, and, on September 1, 1980, attempted to alert airport custom officials. This effort was disregarded. Plaintiff then contacted a friend in the United States Attorney's office, who in turn alerted the FBI. On September 2, 1980, the Lear Jet was flown to the Fort Lauderdale–Hollywood International Airport for repairs. On September 5, 1980, agents of the Federal Bureau of Investiga-

tion (FBI) and the Immigration and Naturalization Service (INS) interviewed the three crew members and a fourth man, arrested the three crew members for violations of the immigration laws, and seized the Lear Jet.

Plaintiff's claim for an informer's award is based upon the immigration statute against bringing in and harboring certain aliens, 8 U.S.C. § 1324 (1982), and the customs statute that authorizes an award of compensation to informers, 19 U.S.C. § 1619 (Supp. II 1984). The immigration law provides that any person who brings into or lands in the United States by any means of transportation any alien knowing that he is in the United States in violation of the law shall be guilty of a felony punishable by fine and imprisonment. 8 U.S.C. § 1324(a). The statute also provides that any conveyance, including any aircraft, which is used in the violation shall be subject to seizure and forfeiture, with certain exceptions not relevant to this case. 8 U.S.C. § 1324(b)(1). All provisions of law relating to the seizure, forfeiture, and condemnation of property for the violation of the custom laws, including the "compromise of claims and the award of compensation to informers in respect to such forfeitures" shall apply to seizures and forfeitures incurred under the immigration statute. 8 U.S.C. § 1324(b)(3). The provisions of the statute with respect to seizures and forfeitures are subject to and enforced by the Attorney General.

The customs statute provides that any person not an employee of the United States who furnishes to a United States Attorney, to the Secretary of the Treasury, or any customs official, "original information" concerning a violation of the customs laws or navigation laws, and such information leads to the forfeiture of property, such person may recover an award that does not exceed 25 percent of the net amount recovered, but not to exceed $250,-000 in any case. 19 U.S.C. § 1619. In 1980, the statute provided the award could not exceed $50,000; amendment, effective October 15, 1984, increased the ceiling to $250,000. The statute was amended in 1986, to make changes in format and structure; the dollar limitation was not affected.

At the time plaintiff's complaint was filed, civil proceedings for forfeiture of the Lear Jet had been started in the District Court for the Southern District of Florida. Right to an informer's award accrues only upon the forfeiture of the property seized. Accordingly, proceedings in this court were delayed by suspensions and stays pending the outcome of the District Court forfeiture proceedings. Stays were in effect from September 12, 1984, to November 25, 1985, and, pending completion of appeals, from February 25, 1986, to October 19, 1987. The total time proceedings in this case were stayed total 2 years and 10 months.

Notwithstanding the periods proceedings were stayed, activity in this case has involved numerous motions, orders, and other matters. These include: six telephone conferences, two protective orders, two motions for sanctions, oral argument and an evidentiary proceeding, in camera examination of documents, and, including the protective orders, 11 orders from the court.

On September 12, 1985, the District Court for the Southern District of Florida ordered the Lear Jet aircraft forfeited to the United States. The forfeiture was based upon violations of the fraudulent visa provisions of 8 U.S.C. § 1182(a)(19) (1982). These violations triggered the criminal penalties of 8 U.S.C. § 1324(a), and the civil forfeiture provisions of 8 U.S.C. § 1324(b). *United States v. One Lear Jet Aircraft, Ser. No. 35A-280, Reg. No. YN-BVO,* 617 F.Supp. 769 (S.D.Fla.1985), *aff'd,* 808 F.2d 765 (11th Cir.), *reh'g granted,* 831 F.2d 221 (11th Cir.1987), *appeal dismissed,* 836 F.2d 1571 (11th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 108 S.Ct. 2844, 101 L.Ed.2d 881 (1988).

Much of the activity in this case is attributable to changes in defendant's litigating position. These changes have involved the need for additional discovery, plaintiff's entitlement to an award, location and valuation of the Lear Jet, and the possibility of a settlement disposition of the case.

The case was returned to active status on November 25, 1985, after the September 12, 1985, District Court forfeiture decision. In a joint preliminary status report filed January 21, 1986, the parties recommended that the proceedings be stayed further pending decision on appeal of the forfeiture decision. The report includes statements that, if the forfeiture decision were sustained on appeal: the parties intend to engage in settlement discussions, the parties do not anticipate proceeding to trial, and that the parties do not anticipate engaging in any further discovery.

After the District Court's forfeiture decision was affirmed on January 23, 1987, plaintiff submitted to defendant a detailed statement of its legal and factual contentions. Defendant's February 25, 1987, status report stated that the agency (INS) was being "contacted to determine its position regarding resolution of this proceeding." Defendant's April 17, 1987, status report stated that plaintiff's submission was being reviewed "by both defendant's counsel and the agency," and that "once defendant has formulated its position respecting plaintiff's proposal, the parties will attempt to reach a proposed settlement of this action." Defendant's May 20, 1987, status report stated that plaintiff's statement of position was being considered by the INS, which agency was "attempting to determine whether there are any funds in the INS forfeiture account which can be used to satisfy any settlement reached."

Defendant's August 17, 1987, status report, conceded the entitlement issue. The report includes the following statements:

—As previously stated, the parties are still attempting to resolve this action. It is undisputed that plaintiff is entitled to receive payment from the Government as a result of the forfeiture of the Lear Jet. Accordingly, the only issue to be resolved between the parties is quantum.

—Defendant's counsel has advised plaintiff's counsel that the Government will make an initial determination of quantum in the near future.

—Defendant's counsel anticipates that these negotiations will result in a settlement figure in the near future. Thereafter, defendant's counsel will initiate the appropriate internal approval procedures to obtain the authority to compromise this litigation.

On October 14, 1987, plaintiff filed a status report which complained that the Government had retracted from a settlement posture. The report stated defendant "had reneged on its concession of liability and announced to plaintiff he was not the original informant and is entitled to no reward." Plaintiff requested a trial at the earliest available date.

During a telephone conference on October 19, 1987, defendant's counsel asserted that the statement on entitlement in the August 17, 1987, status report was in error, and apologized for misleading plaintiff and the court. Defendant's change of position on the liability issue was based upon information from employees in other divisions of the Department of Justice. In this regard the October 19, 1987, order states:

Defendant's counsel claims an INS attorney has stated that an FBI agent has suggested the possibility that plaintiff did not provide the appropriate government authorities with original information concerning a violation which subjected the Lear Jet to forfeiture. Defendant asserts that, until this matter is clarified, further settlement discussions are not appropriate.

During the October 19, 1987, telephone conference, the valuation of the Lear Jet surfaced as an issue. Plaintiff stated that, in the District Court forfeiture proceedings, the Lear Jet was determined to have a value of approximately $3 million. Defendant stated that the appraised value of the Lear Jet plane approximated $200,000. Subsequently, in discovery, this issue was clarified. FBI documents show that at the time of the arrest and seizure, the plane was asserted to be worth $3,300,000. In response to interrogatories, defendant's counsel explained that the reference to the $200,000 value referred to the approximate award an informant of original information might receive.

Defendant in the October 19, 1987, conference reiterated the assertion made in the January 21, 1986, joint preliminary status report that further discovery was not needed. In an effort to have the case proceed in an orderly manner, the order on the October 19, 1987, conference lifted any previous suspensions, and authorized plaintiff to undertake such discovery as may be appropriate, to be completed in 90 days. Plaintiff promptly served discovery requests for production of documents, interrogatories, and for inspection of the aircraft. The requests were excessively broad, and generated numerous disputes and requests for extensions of time. In a revised motion for enlargement of time, filed February 2, 1988, defendant changed its position on its need for discovery. Defendant explained: "After discussing the case with the FBI, however, it appears that defendant may have the need to engage in some limited discovery."

In its discovery effort, plaintiff sought to identify the person whom the Government alleged had supplied the original information on which the seizure and forfeiture were based. Defendant undertook a broad scale assembly of FBI files, and started to collect files from agencies that may have had relevant information. Partial deliveries of documents were made, but many documents and much information were withheld on the ground that the information was confidential or otherwise privileged from discovery. The name of the alleged original informant was not disclosed.

Plaintiff was provided redacted copies of some of the FBI's records that had been requested. Plaintiff complained that the deleted information rendered further discovery effort useless. Plaintiff's February 10, 1988, response to defendant's request for enlargement of time states:

The five volumes contain slightly more than 400 pages of documents in regard to which the government asserts more than 500 claims of privilege. There is barely a page of what appears to be even marginally relevant information without some block of material redacted on the basis of national security, informant privilege or, most frequently, a claim that the document "originated with another government agency" and is still being reviewed.

Most astonishing is that in more than 100 instances the government deletes material on the basis of some variation of the informant's privilege. The principal issue in this case is the identity of the informant who led to the seizure of the Lear Jet. Yet every single time the subject of an informant is addressed in a document, the government has redacted the information.

On March 11, 1988, a hearing was held on plaintiff's request for entry of appropriate orders and sanctions. At the hearing, defendant's counsel stated that plaintiff was not the informant. He stated, further, that he had examined the FBI documents, and some of the documents included information that established that a person other than plaintiff had provided "original information" as that term is used in 19 U.S.C. § 1619. In an effort to resolve the issue as to the identity of the person who provided the original information, arrangements were made for defendant's counsel to assemble those FBI documents which formed the basis for his conclusion that another person provided the original information, and for examination in camera of the assembled documents, unredacted.

Three unredacted documents were delivered timely and were examined in camera. On March 29, 1988, an order was entered after the court's analysis. The order listed the documents by type and in part stated:

The documents delivered by defendant on March 25, 1988, do not establish that a person other than plaintiff provided the original information that lead to the arrest and conviction of the three crew members for violation of 8 U.S.C. § 1182(a)(19) and subjected the Lear Jet to forfeiture under 8 U.S.C. § 1324(b)(3). At most, the documents show that in July 1980, the FBI started a program of surveillance at Miami airports looking for an unidentified Lear Jet that may be operated by a Cuban crew, but with no identification of particular individuals.

The telex identifies an informant and an individual subject. Classification of this document pursuant to the provisions of EO 12356, 47 Fed.Reg. 14874, April 6, 1982, appears to be appropriate as of July 1980.

The March 29, 1988, order directed counsel to confer and to attempt to resolve plaintiff's claim by stipulation.

On May 2, 1988, defendant reported that it was unlikely that the case could be resolved by settlement. The report stated:

Subsequent to receiving the Court's order, the parties discussed the possibility of resolving plaintiff's claim without incurring any additional litigation expenses. The parties were unable to reach an understanding, however, primarily because of their divergent interpretations of the Court's March 29, 1988, order. It is defendant's counsel's understanding that plaintiff construes the Court's order as resolving the entitlement issue in his favor. Defendant, however, believes that the Court's order merely established that the information which was provided *in camera* did not establish that someone other than plaintiff provided the "original information." In defendant's view, this did not establish that the information which was provided by *plaintiff* resulted in the forfeiture of the Lear Jet.

On May 2, 1988, plaintiff reported that Government counsel had refused to enter any stipulations, and that, to resolve the issue, plaintiff would file a motion for summary judgment. Plaintiff's motion for summary judgment was filed on May 2, 1988. Defendant's time to file a response was enlarged to permit settlement negotiations.

On July 29, 1988, a stipulation for entry of judgment was filed, and judgment was entered in favor of plaintiff in the amount of $250,000 in full satisfaction of all claims arising out of or related to matters involved in this law suit. In the stipulation, plaintiff expressly reserved the right to file a claim for attorney fees, costs and expenses pursuant to the Equal Access to Justice Act and other legal theories.

Plaintiff applied to the General Accounting Office for payment of the judgment. The GAO has disclaimed responsibility for payment. This situation is reflected in an August 12, 1988, letter from the Justice Department's Civil Division to INS, which states in part:

On August 10, 1988, our office was orally advised by GAO that GAO was of the opinion that the judgment fund was not available to pay this judgment because the statute which served as the basis for this claim, 19 U.S.C. § 1619, provides that payment will come from the agency that obtained the forfeiture of the property. We advised GAO of the unusual nature of this case, in that Customs statutes were applied to your agency and that, to our knowledge, your agency did not currently possess any appropriations, or other funds, which would be available to satisfy this judgment. GAO maintained its position, however, and advised that we will shortly receive written notification of their position.

## DISPOSITION

Plaintiff's request for attorney fees is based upon two sources of authority: the Equal Access to Justice Act and Rule 11 of this court. Plaintiff melds the requirements of these two sources of authority for award of attorney fees to assert that the Government's position was not "substantially justified" and to avoid the $75 per hour limitation on fee awards in the EAJA. For clarity, the requirements of each source of authority will be examined separately; the standards of the EAJA will be examined first.

■ Under the EAJA, plaintiff in the settlement disposition was the prevailing party and would be entitled to allowance of attorney fees and expenses "unless the court finds that the position of the United States was substantially justified." Plaintiff contends that defendant's changing positions during the course of this case reflect defendant's failure to make any reasonable inquiry into the underlying facts, and that a reasonable inquiry conducted early in the case would have disclosed that

the Government had no reasonable basis in law or fact to deny his claim for an informer's award. Plaintiff asserts that the record establishes that Mr. Block furnished the "original information" required for an informer's award because the information he gave on September 1, 1980, provided the basis for the arrest of illegal aliens under the immigration law that triggered the seizure and subsequent forfeiture of the Lear Jet.

Defendant points out that the Supreme Court's definition of "substantially justified" is less stringent than the former "clearly reasonable" standard. Defendant's position can be justified even though it is incorrect, and it can be substantially justified if a reasonable person could think it correct. *Pierce v. Underwood*, 108 S.Ct. at 2550, n. 2. Defendant continues to assert that, notwithstanding the stipulated settlement, the Government has not conceded that plaintiff was the original informant as defined in the custom law, 19 U.S.C. § 1619. Defendant contends that it settled this case not because there was no merit in its contention that there was another informant, but, because it was in the Government's best interest to avoid disclosure of the numerous confidential documents and sources that would have been required to be disclosed in any further attempt to identify another informant.

Defendant points to *Lacy v. United States*, 221 Ct.Cl. 526, 607 F.2d 951 (1979), to establish that its litigating position was reasonable and warranted by existing law. The facts in *Lacy* are not comparable. The plaintiff in *Lacy* was not eligible for an informer's award because the facts established that the FBI investigation did not start with his information. Other informers provided information on April 19, 1974, and had been paid an informers' award before Lacy filed a claim. The information provided by the first informers was incorporated in an FBI memorandum, and that memorandum was furnished to an investigator of a Senate subcommittee on investigations, who subsequently interviewed Lacy. Lacy did not provide information until August 2, 1974.

The facts in this case are entirely different. No evidence in this case establishes that any person other than Mr. Block provided original information concerning the visa violations that lead to the forfeiture of the Lear Jet. No other original informant has been identified to the court in the documents submitted for in camera inspection. There is no evidence that an investigation was underway with respect to the particular individuals who were arrested, or the Lear Jet that was seized, on September 5, 1980.

Defendant's consent to a settlement disposition in order to avoid disclosure of confidential documents is not sufficient to establish that its position was substantially justified under the EAJA. It may be that the Justice Department's determination that it was in the best interest of the Government not to go forward with additional documents and testimony was reasonable in the light of other responsibilities of the Attorney General. Such considerations, however, are extraneous to the issue of eligibility for an informer's award under the immigration/customs laws, or for attorney fees and expenses under the EAJA.

In this case, to be eligible for an informer's award, plaintiff was obliged to establish that he provided "original information" that lead to the forfeiture. The facts shown by plaintiff clearly establish a prima facie case for an award. Defendant's defense required proof that another person was the original informant. Unless defendant could identify a different person who allegedly furnished the original information, plaintiff could not discredit the defense and prove his claim. Withholding information that establishes the existence and identity of a different original informant would frustrate plaintiff's proof of his claim. Such a result would not accord either with public policy and the objectives to be attained by rewards for informers, or with the provisions of the statutes involved.

In this case, defendant has a direct interest in withholding the information plaintiff needs to overcome the defense. *See Kendland Co. v. Dept. of Navy*, 599 F.Supp. 936,

939 (D.Me.1984) (Plaintiff substantially prevailed but attorney fees were denied notwithstanding refusal to release privileged financial information; government had no direct interest in withholding the information and it was not withheld to avoid embarrassment or to frustrate requestor.). A procedure was established so that the court could be informed as to whether a different original informant existed. Defendant did not submit documents that would establish such information. In the absence of proof of the existence of a different original informant, plaintiff's prima facie case is not overcome.

The Government's change in position, and inaccurate representations, buttress the conclusion that its position was not substantially justified. Plaintiff first submitted a claim to the INS for an informer's award in January 1981. The complaint in this case was filed on March 8, 1984, and the forfeiture was affirmed on January 23, 1987.

Defendant's position in this case, administratively and in litigation, involves personnel and activities of three components of one department—the INS, the FBI, and the Civil Division. The period between submission of a claim to the INS and forfeiture of the aircraft is extensive. There was ample opportunity for a thorough inquiry into the facts. Such inquiry would have developed precise information to identify the original informant. Any reasons that would cause the FBI to refuse to permit disclosure would have been uncovered. Defendant's attorney of record concentrated his inquiry initially on the INS, and failed to coordinate the Department's interests. Absence of thorough familiarity with the facts and implications of those facts on Departmental activities is unreasonable. There has been a failure to undertake a reasonable inquiry into the underlying facts and existing law. The Government's position in this case accordingly, has not been justified to a degree that would satisfy a reasonable person. Inasmuch as plaintiff is the prevailing party and the Government's position is not substantially justified, plaintiff is entitled to recover attorney fees and expenses under the EAJA.

■ The EAJA limits award of attorney fees to $75 per hour unless the court determines that an increase in the cost of living, or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee. 28 U.S.C. § 2412(d)(2)(A)(ii). Plaintiff seeks attorney fees for a counsel in Miami, Florida, and a counsel in Washington, D.C., and asserts that special factors justify an award that is above the $75 limit.

In *Pierce*, the Supreme Court considered the "special factors" justification for adjustment of the $75 per hour cap, and the implications that flow from the statutory example—"the limited availability of qualified attorneys for the proceedings involved." "Special factors" do not include a "short supply" of lawyers skilled and experienced enough to try the case. Nor do they include the situation where the rates for all lawyers in the relevant city, region, or even in the entire country come to exceed the $75 per hour rate adjusted for inflation. The "specific factor" formulation suggests that Congress thought $75 an hour "was generally quite enough public reimbursement for lawyers fees, whatever the local or national market might be." The limited availability of qualified attorneys exception refers to attorneys "having some distinctive knowledge or specialized skill needed for the litigation in question—as opposed to an extraordinary level of general lawyerly knowledge and ability useful in all litigation." *Pierce v. Underwood*, 108 S.Ct. at 2553–54.

Plaintiff claims that special factors warrant an allowance for attorney fees under the EAJA which would equal the counsel's normal rates. Miami counsel is a specialist in customs law and this litigation called for expertise in seizures, forfeitures and informers' awards. Availability of experience and expertise possessed by plaintiff's Miami counsel assertedly is limited. The hourly rate charged by attorneys with such expertise in Miami is $200 per hour. This assertion was supported by an affidavit of another lawyer practicing in Miami.

Washington counsel was retained by plaintiff after the Government withdrew its concession of liability. This circumstance, plaintiff says, created a necessity to redesign and execute a new litigation strategy. Plaintiff contends that defendant's conduct of this case required the retention of additional counsel and that this constitutes a special factor that justifies payment at normal rates. The normal billing rate for Washington counsel is said to be $175 per hour, and for a law clerk $37.50.

The $75 per hour limit may be adjusted to reflect an increase in the cost of living. The Courts of Appeals for the District of Columbia and for the Second Circuit have interpreted the EAJA, as amended in 1985, to require use of the 1981 effective date of the original act as the starting point from which to calculate increases in the cost of living that may justify a higher fee. *Trichilo v. Secretary of Health & Human Services,* 823 F.2d 702, 705–07 (2d Cir. 1987); *Hirschey v. F.E.R.C.,* 777 F.2d 1, 5 (D.C.Cir.1985). *Keyava Const. Co. v. United States,* 15 Cl.Ct. 135 (1988).

In *Keyava,* the $75 per hour statutory rate was increased by a single percentage adjustment (16.6 percent) based upon an increase in the cost of living through February 28, 1986. The CPI–U index in October 1981 stood at 93.4; the average for the January–October 1988 period is 117.8. This represents a 26.124 percent increase. Accordingly, the adjustment to reflect increases in the cost of living to the date of completion of filings on plaintiff's application for fees, October 17, 1988, is 26.124 percent. Application of this factor to $75 produces an increase of $19.59 and an hourly rate of $94.59.

The facts of this case do not warrant an adjustment for special factors. The area of Federal immigration law and custom law involved in this case does not constitute the type of specialized skill that would justify an increase in attorney fees. There has been no showing that there is a shortage of qualified attorneys for this routine type of litigation in Miami or in Washington. *See Esprit Corp., Inc. v. United States,* 15 Cl.Ct. 491, 494 (1988); *Eastern Marine,*

*Inc. v. United States,* 10 Cl.Ct. 184 (1986); *Everett Plywood Corp. v. United States,* 3 Cl.Ct. 705, 713 (1983). This case involved a single issue, the eligibility of plaintiff to recover an informer's award. The circumstance that the nexus of entitlement involved the sometimes arcane immigration and customs laws, and the fact that settlement was delayed by reason of the necessity to await decision in the forfeiture proceeding, which was compounded by changes in defendant's litigating position, do not qualify as special factors that would justify an increase in the basic rate. *Pierce v. Underwood,* 108 S.Ct. at 2553–54.

Plaintiff states that his Miami counsel expended 280.25 hours on this case, and his Washington counsel spent 169.5 hours, with an additional 2.5 hours effort by a law clerk. Miami counsel's time includes the period January 1984 through August 3, 1988. The Washington counsel's work period is from September 1987 through August 17, 1988.

Plaintiff's claim to an informer's award did not arise until judicial consideration of the forfeiture was completed. A prerequisite to any award under 19 U.S.C. § 1619 is the forfeiture of the property. In this case, the forfeiture became final on January 23, 1987, when a panel of the Court of Appeals for the 11th Circuit determined it had jurisdiction notwithstanding removal of the Lear Jet on October 4, 1986, to a warehouse in Missouri, and affirmed the District Court decision. 808 F.2d 765 (11th Cir.1987). The owner of the Lear Jet attempted to obtain reconsideration of the January 23, 1987, decision on the *in rem* jurisdictional issue. The Court of Appeals, en banc, on February 11, 1988, determined it did not have jurisdiction to hear the owner's appeal. 836 F.2d at 1573.

Plaintiff's claim was not viable on March 8, 1984, and the complaint filed on that date was premature. The complaint was not needed to protect against the bar of limitations. It had the effect, however, of giving notice of a developing claim, and it should have served to alert the INS and the FBI of the exposure involved. Plaintiff's time records indicate that a total of approxi-

mately 8.5 hours were devoted in January and February 1984, to preparation and filing of the complaint. This amount of time is accepted as reasonable.

■ Plaintiff's claim for time spent for services of two attorneys after September 1987 is excessive. Plaintiff's Miami counsel previously had performed competently in communications with defendant and in the conduct of this case. Miami counsel was experienced in trial litigation, and the circumstance that a trial in the Claims Court may have been required after defendant changed its position on liability does not create a necessity to double the counsel's workload, nor a necessity to double up on the number of counsel. After September 1987, plaintiff's Washington counsel was largely responsible for design and execution of the litigation strategy that brought the case to conclusion.

Plaintiff's time records indicate that a total of 44 hours were billed by Miami counsel for time spent on this case during the period January 1987 to September 1987. This amount of time is accepted as reasonable.

On the basis of the foregoing, it is concluded that 222.0 hours is a reasonable amount of time for provision of attorney services in this case. Plaintiff is entitled to be compensated under the EAJA for the following number of hours for attorney services:

Miami Counsel (8.5 hours plus 44 hours) 52.5 hours
Washington Counsel                       169.5 hours
                                         ─────────────
                                         222.0 hours

The 222 hours so determined, compensated at the rate of $94.59 per hour results in a total of $20,998.98 for attorney services for plaintiff's Miami and Washington counsel. To this amount, $137.50 is added for the services of 2.5 hours by Washington counsel's law clerk at a rate of $55 per hour. The total award for attorney fees is $21,136.48. This amount is allowed pursuant to the authority provided by the EAJA.

■ Plaintiff seeks compensation under the EAJA for expenses in total amount of $7,488.48. This total includes $5,115.10 expenses of David Block for travel to Washington, hotel accommodations in Washington and telephone expenses in Washington. There is no documentation that support this amount, nor is there documentation that establishes the expenses were in connection with this case. Accordingly, the claim for these expenses of David Block is denied. *Naporano Iron & Metal Co. v. United States,* 825 F.2d 403 (Fed.Cir.1987).

■ Expenses claimed for Washington counsel total $441.92; for Miami counsel plaintiff claims expenses that total $1,931.46. The EAJA provides for recovery by a prevailing party of reasonable legal expenses incurred in the pursuit of the cause of action. The examples set forth in 28 U.S.C. § 2412(d)(2)(A) include reasonable expenses of expert witnesses and the cost of any study, analysis, engineering report, test, or project found to be necessary. The examples are not an exclusive listing. The Federal Circuit has opined that under EAJA authority, a trial court, in its discretion, may award only those reasonable and necessary expenses of any attorney incurred or paid in preparation for trial of the specific case before the court, which expenses are those customarily charged to the client where the case is tried. Expenses of an attorney that are not incurred or expended solely or exclusively in connection with the case before the court, or which expenses the court finds to be unreasonable or unnecessary in the pending litigation, cannot be awarded under the EAJA. *Oliveira v. United States,* 827 F.2d 735, 744 (Fed.Cir.1987). Under this rule, EAJA compensation may include expenses such as for courier services, photocopying and telephone bills, other than expenses that are included in compensable costs under 28 U.S.C. § 1920 (1982).

Plaintiff's application included records that indicate a total of $1500.18 is allowable for reasonable expenses incurred by Miami counsel after January 23, 1987. The $441.92 for expenses listed by Washington counsel are accepted as reasonable and allowable. Accordingly, plaintiff is entitled to compensation for reasonable expenses under the EAJA in total amount of $1,942.10.

## RUSCC 11

Plaintiff uses the provisions of RUSCC 11 to reinforce the contention that defendant's position was not substantially justified, and to avoid the EAJA $75 per hour limitation on attorney fees. Plaintiff concentrates on the obligation in the Rule not to sign a pleading, motion or other paper until "after reasonable inquiry" into the facts and existing law.

The purpose of RUSCC 11 is to discourage dilatory or abusive tactics and to promote efficiency in the litigation process by lessening frivolous claims or defenses. The objectives of the Rule's sanctions are to deter future conduct of the offending attorney, and, by example, to deter other litigants from similar violations. The rule comes into operation by the act of signing a particular pleading, motion or other paper. If the rule is violated, the rule directs that a court "shall impose" sanctions. The court has discretion to tailor sanctions as appropriate to the particular case. Monetary sanctions, including reasonable attorney fees, may be appropriate, or, in the circumstances of a particular case, alternative nonmonetary sanctions may be appropriate.

In this case, defendant's counsel's signature on the August 17, 1987, status report may amount to a violation of the requirements of RUSCC 11. At that time, defendant's counsel apparently had limited his inquiry to the INS. Any misleading of plaintiff and the court, however, was corrected shortly thereafter, and an apology was made, in the October 19, 1987, telephone conference.

■ The real basis of plaintiff's argument as to RUSCC 11, however, is not the failure of defendant's counsel to conduct a "reasonable inquiry" before signing the status report. Plaintiff's argument goes to the failure of the Department of Justice to coordinate adequately the activities of the FBI, the INS, and the Civil Division relative to plaintiff's claim for an informer's award.

Plaintiff has received recognition for the Department's inadequate investigation, and lack of coordination, in the analysis of plaintiff's eligibility for award under the EAJA. Any violation of the requirements of RUSCC 11 do not warrant imposition of monetary sanctions.

Defendant's counsel in this case was the "point man" for the Government's effort, and must bear responsibility for any infraction of Rule 11 that can trigger sanctions. Imposition of sanctions on defendant's attorney of record, however, other than recognition that a reprimand may be appropriate, would not tend to correct the lack of coordination among the interested arms of the Department of Justice.

RUSCC 11 provides discretion for the court to sanction either the signing person, or the represented party, or both. In this case, it is concluded that any sanction should be nonmonetary. Necessary corrective action may more readily be achieved through disciplinary action imposed by Justice Department officials responsible for administrative programs and litigation effort. *See Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. United States,* 16 Cl.Ct. 158, 166 (1989).

## PAYMENT

■ This court entered judgment for plaintiff on July 29, 1988, pursuant to the parties' stipulation. The General Accounting Office (GAO) has refused to certify payment of this judgment. The GAO's refusal to pay the July 29, 1988, judgment on plaintiff's claim is contrary to the statutes applicable to payments of judgments rendered by this court under the Tucker Act, 28 U.S.C. § 1491 (1982).

Congress in 31 U.S.C. § 1304 (1982) has appropriated the amounts necessary to pay final judgments and compromise settlements when (1) payment is not otherwise provided for, (2) payment is certified by the Comptroller General, and (3) the judgment is payable under 28 U.S.C. § 2517 (1982).

Every final judgment of the United States Claims Court rendered against the United States is to be paid out of the judgment fund. Special reference is made to the Contract Disputes Act of 1978 in order to give effect to the authorization for judgments arising under express or implied con-

tracts of specified service Exchanges. This authorization permits prompt payment of judgments on express or implied contracts of Exchanges, and requires the Exchange to reimburse the government. Judgment against the United States on a claim under the Contract Disputes Act is to be paid promptly in accordance with the procedures provided by 31 U.S.C. § 1304. 41 U.S.C. § 612 (1982) and 31 U.S.C. § 1304(c) (1982).

Claims Court judgments are to be paid pursuant to the authority of 28 U.S.C. § 2517, Payment of Judgments, as follows:

(a) Except as provided by the Contract Disputes Act of 1978, *every final judgment* rendered by the United States Claims Court against the United States shall be paid out of any general appropriation therefor, on presentation to the General Accounting Office of a certification of the judgment by the clerk and chief judge of the court. [Emphasis supplied.]

(b) Payment of any such judgment and of interest thereof shall be a full discharge to the United States of all claims and demands arising out of the matters involved in the case or controversy, unless the judgment is designated a partial judgment, in which event only the matters described therein shall be discharged.

Judgments of the Court of Claims, and its successor the Claims Court, historically since 1866 have been paid from general appropriations. This procedure was enacted in response to the recognition of the need for finality of judgments in claims against the United States. Act of March 17, 1866, 14 Stat. 9; *see* Court History, 216 Ct.Cl. 1, 20–25, 573 F.2d 52 (1978).

GAO's failure to certify the July 29, 1988, judgment is based on a strained construction of 31 U.S.C. § 1304(a). The INS has no funds to pay the informer's award authorized by 19 U.S.C. § 1619. GAO's decision to defer payment pending enactment of subsequent appropriations encroaches on the finality of judgments in claims against the United States, and derogates from the Tucker Act duty of the Government to render prompt justice against itself, in favor of its citizens. Plaintiff's July 29, 1988, judgment should have been paid promptly on presentation to the GAO. Accommodation of the Department's internal accounting to reflect ultimate responsibility for Departmental operations is an administrative matter that may be deferred for subsequent action. This administrative detail, however, may not be at the expense of prompt payment to a claimant with a valid judgment.

CONCLUSION

On the basis of the foregoing, plaintiff is entitled to an award for attorney fees and expenses. Plaintiff's application for attorney fees and expenses is granted under the EAJA to the extent stated above. The Clerk is directed to enter judgment in favor of plaintiff for $23,078.58. Costs to plaintiff.